## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, 378 North Main Avenue, Tucson, AZ 85701, HUMANE SOCIETY INTERNATIONAL, 1255 23rd Street NW, Suite 450, Washington, DC 20037, *and* THE HUMANE SOCIETY OF THE UNITED STATES, 1255 23rd Street NW, Suite 450, Washington, DC 20037, *Plaintiffs*, v. DEBRA HAALAND, *in her official capacity as Secretary of the Interior*, U.S. Department of the Interior, 1849 C Street NW, Washington, DC 20240, *and* U.S. FISH AND WILDLIFE SERVICE, 1849 C Street NW, Washington, DC 20240, *Defendants*. | Civil No. 21-2660 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      Plaintiffs Center for Biological Diversity, Humane Society International, and the Humane Society of the United States (collectively, "Plaintiffs") bring this action under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, to challenge the failure of the

1

Secretary of the Interior ("Secretary") and the U.S. Fish and Wildlife Service (collectively, "Defendants" or "the Service") to make a statutorily required 12-month finding on Plaintiffs' April 2017 petition to list giraffes (*Giraffa camelopardalis*) under the ESA ("Petition"). 16 U.S.C. § 1533(b)(3)(B). Plaintiffs respectfully request that this Court order Defendants to make this overdue finding on the Petition by a date certain.

2.      The ESA requires that the Service, upon receiving a citizen petition to list a species, make an initial finding within 90 days regarding whether or not the petitioned action "may be warranted" ("90-day finding"). 16 U.S.C. § 1533(b)(3)(A). If the Service issues a positive 90-day finding, the ESA requires the Service to find whether listing "*is* warranted" within 12 months of receiving the petition ("12-month finding"). *Id.* § 1533(b)(3)(B) (emphasis added).

3.      On April 26, 2019—more than two years after receiving Plaintiffs' Petition, and only after Plaintiffs filed a lawsuit against Defendants—Defendants issued a 90-day finding that concluded that Plaintiffs' Petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted for the giraffe due to" several threats facing the species. Endangered and Threatened Wildlife and Plants; 90-day Findings for Four Species, 84 Fed. Reg. 17,768, 17,770 (Apr. 26, 2019). However, the Service has failed to make a 12-month finding on the Petition, which is now long overdue. Compliance with the ESA's mandatory 12-month deadline is necessary to help ensure the continued survival of giraffes, which have suffered devastating declines over the past 30 years.

4.      Giraffes are one of the most well-recognized and iconic African wildlife species. While giraffes once occupied much of Africa's savannah and savannah woodlands, today they are found in only small, isolated fragments of their once expansive range. With their long necks, tongues, and eye lashes; uniquely patterned coats; and distinctive gaits, giraffes have long captured

2

the human imagination. But giraffes are also important to their savannah ecosystem. Their height enables them to provide early warnings to nearby mammals about approaching predators, in addition to allowing them to browse on tall and hard-to-reach vegetation. Additionally, giraffes' intensive grazing of acacia trees helps support ant colonies that protect these trees from insects likely to kill them. Acacia trees are an important food source for many African savannah species.



*Photograph by Brett Hartl, Uganda 2018*

5.      Giraffe populations are now declining, and these iconic animals face extinction. In 2016, the International Union for Conservation of Nature ("IUCN") classified the species as vulnerable to extinction, estimating that giraffes have undergone a 36 to 40 percent population decline over the past 30 years. Two years later, IUCN reaffirmed giraffes' vulnerable status and reiterated that only about 97,500 giraffes remain in Africa now compared to the over 150,000 giraffes estimated in 1985.

6.      Giraffes face myriad threats including habitat destruction and fragmentation; overutilization from illegal hunting, trophy hunting, and the international commercial trade in giraffe parts (e.g., bone, skin, etc.); disease and predation; and the inadequacy of current regulatory

3

mechanisms. United States data show an increase in imports of giraffe bone carvings and hunting trophies from 2011 to 2015 and an increase in imports of giraffe skin pieces and shoes from 2014 to 2015. More recent research reveals continued demand in the U.S. market for giraffe bones for carvings and knife and gun handles as well as for skins and hunting trophies. The combination of threats puts the species at risk of extinction and in need of immediate protections.

7.      These ongoing threats to giraffes and the clear science documenting the species' decline prompted Plaintiffs to petition the Service on April 19, 2017, to protect giraffes pursuant to section 4 of the ESA. Thereafter, giraffes were listed on Appendix II to the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"). However, that listing only regulates trade; it does not foreclose it. Additionally, under a CITES Appendix II listing, the Service is not required to make any scientific finding for these imperiled animals and their parts to be imported into the United States. And because CITES governs only international trade (trade between countries), giraffe parts or products that are lawfully imported into the United States can be freely sold and transported domestically, leading to further demand. Therefore, despite the CITES listing of giraffes, the ESA would afford these majestic animals important protections against extinction.

8.      More than four years have passed since Plaintiffs submitted the Petition, and over two years have passed since the Service found that listing giraffes "may be warranted." Yet the Service has not issued the required 12-month finding as of the date of this Complaint. The Service's failure to move the ESA listing process forward pursuant to the ESA's deadlines places giraffes at greater risk of extinction.

9.      As a result, Plaintiffs seek declaratory and injunctive relief to enforce the mandatory deadline for Defendants to make a 12-month finding on the Petition, obtain a date

certain by which Defendants will issue a 12-month finding on the Petition, award Plaintiffs their

fees and costs associated with this litigation, and such other relief as may be necessary.

## JURISDICTION AND VENUE

10.     This action arises under the ESA, 16 U.S.C. §§ 1531-1544, and relief is

appropriately awarded under the ESA, 16 U.S.C. § 1540(g); the Declaratory Judgment Act, 28

U.S.C. §§ 2201, 2202 (declaratory and injunctive relief); and the Court's equitable powers.

11.     The Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(c),

(g)(1)(C) (action arising under ESA citizen suit provision), 28 U.S.C. § 1331 (federal question

jurisdiction), and 28 U.S.C. § 1346 (actions against the United States).

12.     As required by section 11(g) of the ESA, on October 14, 2020, Plaintiffs provided

Defendants with written notice of their intent to file this suit pursuant to the ESA's citizen suit

provision, 16 U.S.C. § 1540(g)(2)(C).

13.     Defendant Secretary of the Interior (then David Bernhardt, now Debra Haaland)

received Plaintiffs' notice letter by email on October 14, 2020, and by first class, certified mail on

October 22, 2020.

14.     Defendant U.S. Fish and Wildlife Service received Plaintiffs' notice letter by email

on October 14, 2020, and by first class, certified mail on October 20, 2020 (directed to then-Acting

Director Aurelia Skipwith) and on October 30, 2020 (to Assistant Director for Endangered Species

Gary Frazer).

15.     On December 18, 2020, Defendants responded to Plaintiffs' notice letter but

declined to immediately make a 12-month finding for giraffes.

16.     Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(e) and 16

U.S.C. § 1540(g)(3)(A), as this civil action is brought against officers and employees of the United

States acting in their official capacities and under the color of legal authority; a substantial part of the events giving rise to Plaintiffs' claim occurred in the District of Columbia; Defendants are headquartered in this district; Plaintiffs Humane Society International and Humane Society of the United States are headquartered in the District of Columbia; and no real property is involved in the action.

17.     The federal government's sovereign immunity is waived by 16 U.S.C. § 1540(g).

## PARTIES

### Plaintiffs

18.     Plaintiff the Center for Biological Diversity ("Center") is a 501(c)(3) nonprofit corporation incorporated in the State of California with headquarters in Tucson, Arizona. The Center maintains offices throughout the United States, including in the District of Columbia, California, Arizona, Florida, Oregon, North Carolina, and Washington and in Baja California Sur, Mexico, as well as other locations. The Center works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction. The Center's International Program works to protect global biodiversity by using U.S. and international law to hold governments accountable for threatening imperiled species wherever they are found. In pursuit of this mission, the Center has been actively involved in securing protections for species abroad, including the giraffe. The Center has more than 89,000 members and more than 1.7 million online supporters. In addition to Plaintiffs' efforts to protect giraffes under the ESA, the Center and its allies worked successfully to secure protections under CITES for giraffes in 2019. The Center and its members are concerned with the conservation of imperiled species, including giraffes, and with the effective implementation of the ESA. The ongoing extinction of giraffes prompted the Center to take action by working to secure additional international protections and

striving to ensure the United States is a leader in conserving this highly imperiled species including by protecting giraffes under the ESA. The Center was a co-petitioner on the Petition.

19.     Plaintiff Humane Society International ("HSI") is a global nonprofit organization headquartered in Washington, DC, with offices and programs around the world, including Africa. HSI works to combat animal abuse and exploitation and to promote animal protection and welfare. HSI actively advocates against unsustainable trade in wildlife, including giraffes. HSI was instrumental in securing improved legal protections for giraffes under CITES and has advocated for improved U.S. protections under the ESA and proposed state and federal legislation, as well as for local protections in giraffes' range countries. HSI was a co-petitioner on the Petition.

20.     Plaintiff the Humane Society of the United States ("HSUS") is a nonprofit charitable organization incorporated in 1954 and headquartered in Washington, DC. HSUS is the nation's largest animal protection organization, with millions of members and constituents. HSUS' mission is to fight to end suffering for all animals. In furtherance of this mission, HSUS has shown particular interest in endangered and threatened species and supports efforts aimed at the protection and recovery of such species, including giraffes, and their habitat and has worked for decades to improve the plight of African wildlife. HSUS regularly submits comments to government agencies concerning proposed actions that would affect wild animals, including listing and delisting decisions pursuant to the ESA. HSUS also works to pass legislation at the state and federal levels to protect giraffes and other imperiled species and has engaged in undercover investigations to reveal the extent of sale of products made from giraffes and other imperiled animals. HSUS was a co-petitioner on the Petition.

21.     Plaintiffs' organizations, members, and supporters include individuals who enjoy observing, photographing, filming, and otherwise appreciating giraffes and their habitat. These

individuals derive professional, scientific, educational, recreational, aesthetic, moral, spiritual, and other benefits from giraffes and their habitat in the wild. Plaintiffs have members who have visited and have concrete plans to again visit giraffe habitat.

22.     For example, Center member Brett Hartl has traveled to Africa to view wildlife, including giraffes, regularly since his first visit to Tanzania in 2010. Since then, he has visited South Africa, Namibia, and Botswana in 2015, Ghana in 2017, Uganda in 2018, and Kenya and the Central African Republic in 2019. During all of these trips, looking for, observing, and photographing giraffes in their habitat has brought Mr. Hartl great aesthetic enjoyment. He is returning to South Africa in October 2021 and plans to visit Zambia, Zimbabwe, and Tanzania in 2023, COVID-19 conditions permitting. During these trips, he will continue deriving aesthetic enjoyment from looking for, observing, and photographing giraffes in their habitat.

23.     HSUS member Audrey Delsink is the Wildlife Director of HSI in Africa and has a Doctorate of Philosophy in Biology. Dr. Delsink lives in South Africa and gains great personal fulfillment and aesthetic enjoyment from viewing and photographing giraffes and their habitat in South Africa and other African countries. She worked to obtain CITES protections for giraffes and still works to protect giraffes from international trade and trophy hunting. From 1998 through 2016, she lived on a game reserve in South Africa, where seeing giraffes in their natural habitat was a meaningful part of her daily life. Since 2018, Dr. Delsink has annually traveled to multiple game reserves within South Africa for work, and she enjoys seeing giraffes and other wildlife during these trips. She also travels several times a year with her family to game reserves in South Africa to view wildlife, including giraffes. Dr. Delsink last went on one of these vacations in August 2021. She has concrete plans to continue her work and personal trips within South Africa at the same frequency, including a work trip scheduled to take place from October 3 through

October 16, 2021, during which she plans to view giraffes. Dr. Delsink also traveled to Namibia in 2017, Malawi in 2018, and Kenya in 2019 for work. During these trips, she enjoyed seeing giraffes in their natural habitat. She has concrete plans to return to Namibia in late 2021 or in 2022, depending on when needed permits for the trip are secured, and she plans to travel to Malawi and Mozambique in 2022. When she travels for work or personal reasons, Dr. Delsink always spends time viewing and photographing wildlife, including seeing as many giraffes as she can.

24.     HSUS member Heidi Osterman visits Zambia regularly, including in 2015, 2016, 2018, 2019, and 2021, in part due to her significant volunteer work for a philanthropic conservation organization that leads wildlife viewing safaris in South Luangwa National Park and provides conservation education to the public. Ms. Osterman and her husband financially sponsor two rangers who protect giraffes and other wildlife from poachers and wildlife trafficking in Zambia. Ms. Osterman most recently traveled to Zambia and Kenya from August 19 through September 4, 2021, where she enjoyed viewing giraffes and other wildlife. While in Kenya, both in 2021 and previously in 2016, she saw giraffes in their natural habitat and visited a wildlife sanctuary for giraffes and other species. She has concrete plans to continue to return to African countries, including Zambia, to view and photograph giraffes and other wildlife; Ms. Osterman and her husband have already booked a wildlife-viewing safari in Zambia scheduled from February 25 through March 7, 2022. Ms. Osterman is particularly enamored by giraffes' peaceful and curious demeanor and derives great personal fulfillment and aesthetic enjoyment in seeing these animals in their natural habitat.

25.     HSUS member Iris Ho has devoted her career to protecting and conserving foreign wildlife, such as giraffes, from unsustainable trophy hunting and other threats. From 2010 until October of this year, Ms. Ho worked for HSI, most recently serving as HSI's Wildlife Policy

Director. In this role she worked to protect giraffes from various threats, including international and U.S. domestic trade, both prior to and after the CITES listing. Beginning in November of this year, Ms. Ho will be the Head of Campaigns and Policy for a nonprofit organization dedicated to rescuing, caring for, and advocating on behalf of African wildlife. Additionally, Ms. Ho serves on the board of directors for a wildlife conservation organization in Tanzania. She has also worked closely for many years with a nonprofit organization that leads philanthropic wildlife viewing safaris in Zambia and works to secure, enforce, and implement protections against wildlife trafficking. Ms. Ho visited Africa many times between 2015 and 2020, including Tanzania, Zambia, Kenya, and South Africa, and observed giraffes on many of these trips. While Ms. Ho is not currently traveling internationally due to the COVID-19 pandemic, she has plans to return to both Tanzania and Zambia to view giraffes and other species in the wild once it is safe to travel again, likely in 2022. She also plans to visit other African countries for work, in her new position. When Ms. Ho travels to Africa she frequently goes on walking and photographic safaris and derives great personal fulfillment and aesthetic enjoyment from viewing and photographing giraffes and other species in their natural habitat.

26.    An integral aspect of Plaintiffs' members' use and enjoyment of giraffes is the expectation and knowledge that these animals persist in their native habitat. For this reason, Plaintiffs' members' use and enjoyment of giraffes are entirely dependent on the continued existence of healthy, sustainable populations of the species in the wild. As giraffes decline or become more highly fragmented, Plaintiffs' members will be less likely to be able to view and enjoy giraffes on their regular trips to giraffe habitat, injuring members' interests in the species.

27.    Defendants' failure to comply with the ESA's non-discretionary deadline for issuing a 12-month finding deprives giraffes of statutory protections that are vital to their survival

and recovery. Until the species is adequately protected under the ESA, Plaintiffs' and their members' interests in giraffes and their conservation and recovery are impaired.

28.    Defendants' failure to comply with the ESA's non-discretionary deadline for issuing a 12-month finding for giraffes directly, adversely, and irreparably harms Plaintiffs' and their members' interests in giraffes. This harm is ongoing and will continue unless and until this Court provides the relief prayed for in this Complaint.

29.    The relief sought in this Complaint would redress Plaintiffs' and their members' injuries by providing giraffes with important protections and benefits. The ESA generally bans the import, export, and sale of endangered species in interstate and foreign commerce, 16 U.S.C. § 1538(a), and requires the Service to issue regulations deemed "necessary and advisable" for the conservation of threatened species, *id.* § 1533(d). The ESA also provides for "international cooperation" in the conservation of foreign species. *Id.* § 1537. ESA listing increases awareness of listed species and their threats; stimulates research efforts to address conservation needs; and increases funding for conservation of species in their range countries, including habitat conservation. Under the ESA, the Service provides financial assistance for programs to conserve listed species in foreign countries, encourages conservation programs for such species, and offers other related assistance, such as personnel and training.

30.    Therefore, Plaintiffs and their members are injured by Defendants' failure to make a timely listing decision under the ESA. Defendants' protracted failure to act prevents the application of the ESA's substantive protections that are vitally important to giraffe survival and eventual recovery. These are actual, concrete injuries from which Plaintiffs and their members presently suffer; are directly caused by Defendants' acts and omissions; and will continue to occur

unless the Court grants relief. The relief sought herein would redress these injuries. Plaintiffs and their members have no adequate remedy at law.

**Defendants**

31.     Defendant Debra Haaland is the Secretary of the Interior and the federal official in whom the ESA vests final responsibility for making decisions and promulgating regulations required by and in accordance with the ESA, including listing decisions. Secretary Haaland is sued in her official capacity.

32.     Defendant the United States Fish and Wildlife Service is the agency within the Department of the Interior that is charged with implementing the ESA, including for giraffes, as well as ensuring prompt compliance with the ESA's mandatory listing deadlines. This authority encompasses proposed and final listing decisions for foreign species, including giraffes.

**LEGAL BACKGROUND**

**Endangered Species Act**

33.     The Endangered Species Act ("ESA" or "Act"), 16 U.S.C. §§ 1531-1544, provides comprehensive protections for both domestic and foreign endangered and threatened species.

34.     In passing the Act, Congress found that "various species . . . have been rendered extinct as a consequence of economic growth and development untampered by adequate concern and conservation" and that "other species . . . have been so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. § 1531(a)(1)-(2).  Accordingly, the purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." *Id*. § 1531(b).

35.     To this end, section 4 of the ESA requires the Secretary to protect imperiled species by listing them as either "endangered" or "threatened." 16 U.S.C. § 1533(a). The Secretary has delegated her administration of the ESA to the U.S. Fish and Wildlife Service. 50 C.F.R. § 402.01(b).

36.     A "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). An "endangered species" is any species that "is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). A "threatened species" is any species that "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

37.     The Service must list a species under the ESA if the species is endangered or threatened due to: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1).

38.     The Service must make listing determinations "solely on the basis of the best available scientific and commercial information regarding a species' status." 50 C.F.R. § 424.11(b); *see also* 16 U.S.C. § 1533(b)(1)(A).

39.     Once a species is listed, the ESA's conservation measures apply to protect it.

40.     Endangered species are automatically protected under section 9 of the ESA, which includes a prohibition on the import, export, and interstate commerce in endangered species or attempts to engage therein, 16 U.S.C. § 1538(a)(1)(A), (D)-(G), (g), unless such activity is "for

scientific purposes or to enhance the propagation or survival of the affected species." *Id.* § 1539(a)(1)(A).

41.     Under section 4(d) of the ESA, the Service must issue regulations to conserve threatened species and may extend to them the statutory protections afforded to endangered species by section 9. 16 U.S.C. § 1533(d).

42.     The ESA further provides for "international cooperation" in the conservation of foreign species. 16 U.S.C. § 1537. According to the Service, the listing of foreign species also provides for "increased awareness of listed species, research efforts to address conservation needs, or funding for in-situ conservation of the species in its range countries." The agency has further explained that listing provides funding for management programs developed to conserve listed species and to encourage development of conservation programs for listed species as well as capacity building programs.

43.     To ensure the timely protection of species at risk, Congress set forth a detailed process whereby citizens may petition the Service to list a species as endangered or threatened and deadlines for the Service to respond to such petitions. 16 U.S.C. § 1533(b); 50 C.F.R. § 424.14.

44.     The petition process includes nondiscretionary deadlines so that species in need of protection receive the ESA's substantive protections in a timely fashion. The ESA requires three findings on petitions that warrant action: a 90-day finding, a 12-month finding, and for species that the Service determines warrant protection, a final listing determination.

45.     Upon receipt of a listing petition, the Service must "to the maximum extent practicable, within 90 days" make an initial finding as to whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(h)(1). This finding is referred to as a "90-day finding."

46.     If the Service finds that the petition does not present substantial information indicating that listing may be warranted, the agency must publish that finding, and the petition is rejected. 50 C.F.R. § 424.14(h)(1).

47.     If, on the other hand, the Service determines that a petition presents substantial information indicating that listing may be warranted, the agency must publish that finding and conduct a full scientific review of the species' status, which is known as a "status review." 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(h)(1). Then, within 12 months of receiving the petition, the Service must make a finding that: (1) listing is "warranted;" (2) listing is "not warranted;" or (3) listing is "warranted but . . . precluded" by other pending listing proposals, provided certain requirements are met. 16 U.S.C. § 1533(b)(3)(B). This decision is referred to as a "12-month finding."

48.     If the Service's 12-month finding concludes that listing is warranted, the agency must "promptly publish" notice of a proposed regulation to list the species as endangered or threatened in the Federal Register for public comment. 16 U.S.C. § 1533(b)(3)(B)(ii). Within one year of publication of the proposed regulation, the ESA requires the Service to render its final determination on the proposal. *Id.* § 1533(b)(6)(A). This is known as a "final listing determination." At such time, the Service must either list the species, withdraw the proposed listing rule, or if there is substantial disagreement about scientific data, delay a final determination for up to six months to solicit additional scientific information. *Id.* § 1533(b)(6)(A)(i), (B)(i).

## Convention on International Trade in Endangered Species

49.     The Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") is an international treaty governing trade in imperiled species of wildlife and plants. CITES, Mar. 3, 1973, 27 U.S.T. 1087. CITES recognizes that "wild fauna and flora in their

many beautiful and varied forms are an irreplaceable part of the natural systems" and that "international cooperation is essential for the protection of [these] species . . . against over-exploitation through international trade." *Id.*, Preamble.

50.     To receive protection under CITES, species must be included on one of the three CITES Appendices, and each Appendix provides listed species varying degrees of protection.

51.     Species on Appendix I of CITES are "threatened with extinction," CITES, art. II, ¶ 1, and are afforded the highest level of protections. CITES strictly bans all commercial, international trade in Appendix-I species, although non-commercial trade in scientific, zoological, and other specimens may still occur with proper permitting. CITES, art. III, ¶¶ 1-3.

52.     Appendix-II species are "not necessarily now threatened with extinction [but] may become so unless trade . . . is subject to strict regulation in order to avoid utilization incompatible with their survival" or otherwise "must be subject to regulation in order that trade in specimens of [other listed species] may be brought under effective control," for example, if the species is difficult to distinguish from other CITES-listed species. CITES, art. II, ¶ 2.

53.     International trade in Appendix-II species is permitted if the exporting nation issues a valid CITES export permit. CITES, art. IV. To issue a valid export permit: (1) the exporting nation's designated CITES Scientific Authority must find the export "will not be detrimental to the survival of the species," and (2) the exporting nation's CITES Management Authority must "be satisfied that the specimen was not obtained in contravention of the laws of th[e] State for the protection of fauna and flora." *Id*. art. IV, ¶ 2(a), (b).

54.     While international trade in Appendix-I species additionally requires the importing nation to issue a valid CITES import permit, including a finding by the importing nation's designated CITES Scientific Authority that the import "will be for purposes which are not

detrimental to the survival of the species," international trade in Appendix-II species does not require any CITES import permit or finding by an importing nation. *Compare* CITES, art. III, ¶ 3, *with* CITES, art. IV.

55.     CITES also requires Parties to report trade of CITES-listed species, CITES, art. VIII, ¶¶ 6(b), 7(a), and the information in those reports is made publicly available through an online database. Parties are urged to submit their reports by October 31 for the previous year's trade data, CITES Resolution Conf. 11.17 (Rev. CoP18), creating a delay in the data's availability.

56.     In the United States, CITES is implemented by the Service pursuant to the ESA and the Service's CITES regulations. 16 U.S.C. §§ 1537a, 1538; 50 C.F.R. §§ 23.1-23.92.

## FACTUAL BACKGROUND

57.     Giraffes are the world's tallest land mammal, well-known for their long-necks, long eyelashes, and distinctive coats. Despite their popularity, relatively little scientific research has been conducted on the species; questions remain as to how and why they developed such long necks and how they regulate the highest blood pressure of any land mammal.



*Photograph by Heidi Osterman, Zambia 2019*

58.    Giraffes once occupied much of the savannah and savannah woodlands of Africa. Today, they are only found in fragments of their historic range.

59.    The IUCN Giraffe and Okapi Specialist Group currently recognizes one species of giraffe (*Giraffa camelopardalis*) and nine subspecies: West African (*Giraffa camelopardalis peralta*); Kordofan (*G. c. antiquorum*); Nubian (*G. c. camelopardalis*); Reticulated (*G. c. reticulata*); Rothschild's (*G. c. rothschildi*); Masai (*G. c. tippelskirchi*); Thornicroft's (*G. c. thornicrofti*); Angolan (*G. c. angolensis*); and South African (*G. c. giraffa*).

60.    As a result, Plaintiffs' Petition asks the Service to protect the giraffe as an endangered species under the ESA. Alternatively, if taxonomic consensus changes or the Service decides to list an entity below the species level, the Petition requests that all giraffe subspecies or distinct population segments be protected at least as threatened, with qualified subspecies or distinct population segments protected as endangered.

61.    Giraffes have experienced severe habitat loss and fragmentation, including from conversion of native habitat to agricultural use, uncontrolled timber harvest, poor land use planning, and urban expansion.

62.    Giraffes are hunted legally for trophies and food. While many range countries nominally protect the species, lax enforcement of wildlife laws in range countries has allowed illegal poaching for bushmeat, bones, tail hair, and other parts. Poaching, as well as legal trophy hunting, is further spurred by the international trade in giraffe parts and products. The species is further threatened by civil unrest.

63.    An analysis of data from the Service's Law Enforcement Management Information System database ("LEMIS") and an assessment of online sales of giraffe products revealed that the United States is a major importer of giraffe parts and derivatives. As documented in the

Petition, between 2006 and 2015, the United States imported 21,402 bone carvings, 3,008 skin pieces, and 3,744 hunting trophies. The LEMIS database also documented an increase in commercial imports of giraffe bone carvings, skin pieces, and shoes during these years as well as hunting trophies. Online research revealed that giraffe bones are increasingly being used as a substitute for ivory in items, such as knife and gun handles.

64.     A subsequent 2018 investigation by Plaintiffs HSI and HSUS revealed that giraffe parts and products continue to be sold online and in stores by at least 51 dealers across the United States. The investigation also found that American trophy hunters supply the U.S. market with giraffe trophies and parts, including skins and bones.



*Photograph by HSUS, giraffe hide pillows for sale Myakka, Florida*

65.     More recent research, conducted in 2021, shows that giraffe parts and products remain widely available for interstate sale in the United States, including through the internet. These parts and products include, but are not limited to, bone carvings and other products made from giraffe bone, such as pens and knife and gun handles. Boots, rugs, pillows, wallets, and other products made from giraffe body parts such as skins are also widely available for sale.

66.     Giraffes were listed on Appendix II of CITES on November 29, 2019, and as a result, CITES Parties have been required to report giraffe trade to CITES authorities since that date. CITES, art. VIII, ¶¶ 6(b), 7(a).

67.     For 2019, the CITES trade database reports 89 trade entries for giraffes and their parts beginning November 29, 2019 (the date on which giraffes were listing on Appendix II) through the end of that calendar year. Of those 89 entries, 27 were for exports of giraffes or their parts to the United States. Those exports consisted of hunting trophies (nine entries consisting of 222 trophies), skulls (two entries consisting of nine skulls), skins and skin pieces (four entries consisting of six skins), 45 live giraffes, leather products (four entries consisting of 18 products), bones (six entries consisting of 45 bones), and four bodies. However, as of the time of filing this complaint, the CITES trade database did not contain any U.S.-reported imports of giraffe; only certain exporter-reported data was available. There is often a multi-year lag in the reporting and processing of data for the CITES trade database. Thus, the 2019 data are not comprehensive, do not reflect all the trade that occurred once giraffes were listed under CITES in late November 2019, and likely vastly understate the true volume of trade.

68.     The 2020 and 2021 CITES trade data are not yet available.

69.     In addition to overutilization for commercial and other purposes, giraffes are further threatened by disease, inbreeding due to isolated populations, collisions with automobiles and airplanes, and the increased frequency and magnitude of droughts associated with climate change.

70.     The need for giraffe conservation is dire. While giraffes are now listed on Appendix II of CITES, that listing does not require the Service to make *any* scientific finding to allow these imperiled animals and their parts to be imported into the United States, let alone traded within the country. In contrast, ESA section 9's prohibition on import, export, and interstate sale would

benefit giraffes by curtailing all trade that is not "for scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A).

71.     Giraffes are also listed on Appendix II of the Convention on Migratory Species ("CMS"). However, the listing does not provide on-the-ground protections for giraffes. CMS Art. IV.1. Instead, CMS Parties adopted a concerted action plan calling for "an Africa[-]wide giraffe conservation strategy" as well as national strategies to be developed to implement the treaty's habitat conservation and recovery requirements, which has not yet occurred for giraffes.

72.     Despite the threats to giraffes and the inadequate conservation measures currently available to protect them, the Service concluded, in its response to Plaintiffs' notice of their intent to file this lawsuit, that giraffes were a lower conservation priority than multiple other foreign species because measures are underway to reduce threats to giraffes.

73.     No habitat protections have been adopted for giraffes as a result of their CMS listing. A CITES Appendix-II listing only requires export permits and related findings, and CITES' standards for trade are less stringent than those of the ESA. CITES Appendix-II listing does not prohibit trade, require import permits or related findings, or provide the ESA's full suite of trade protections. Nevertheless, under the Service's workplan for foreign species, giraffes will not receive a 12-month finding *until Fiscal Year 2025* – eight years after Plaintiffs' Petition and seven years past the ESA's mandatory deadline for the finding.

74.     In its foreign species workplan, the Service outlines the fiscal year in which the agency intends to make 12-month findings, proposed listing rules, and final listing rules. Since the date that Plaintiffs filed the Petition, the Service has taken few of these listing actions for foreign species.

75.     The Service is behind on its workplan, even though the agency only issued the plan a little over a year ago, in June 2020.

76.     The Service has already failed to meet numerous timelines within the foreign species workplan, making it unlikely the Service will even issue the giraffe 12-month finding by the nonbinding timeline—set by the agency itself—four years from now.

77.     As of the date of the filing of this Complaint, the Service has not yet completed all of the listing actions (12-month findings/proposed listings and final listing rules) it planned to complete in Fiscal Year 2020 (which ended on September 30, 2020), and it has issued only two of eleven listing actions it planned to complete in Fiscal Year 2021 (which ended on September 30, 2021). Of those two listing actions the Service completed, one was a proposal to list the emperor penguin, which was required by date certain under a court order.

78.     The Service's failure to meet its own non-binding timelines demonstrates that a court order is required to ensure that the Service makes its 12-month finding on Plaintiffs' Petition by a date certain.

79.     In the past, the Service undertook foreign species listing actions at a significantly faster annual pace but has significantly slowed its annual pace of taking these actions in recent years—despite no significant budgetary changes.

80.     Given the Service's demonstrated ability to take foreign species listing actions at a faster pace, it is practicable for the Service to make the requisite 12-month finding on Plaintiffs' Petition well before Fiscal Year 2025.

## CLAIM FOR RELIEF

### Violation of the Endangered Species Act (16 U.S.C. § 1533(b)(3)(B))
### Failure to Make a 12-Month Finding for Giraffes

81.     Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth below.

82.     Defendants' protracted and ongoing failure to make the statutorily required 12-month finding on Plaintiffs' Petition to list giraffes under the Endangered Species Act violates the Act, 16 U.S.C. § 1533(b)(3)(B), and its implementing regulations, 50 C.F.R. § 424.14(h)(2).

83.     Plaintiffs and their members are injured by Defendants' continued failure to issue the required 12-month finding and their injuries would be redressed if this Court grants Plaintiffs' requested relief.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court grant the following relief:

A.     Declare that Defendants have violated the ESA by failing to issue a timely 12-month finding on Plaintiffs' Petition to list giraffes, 16 U.S.C. § 1533(b)(3)(B);

B.     Order Defendants to issue, by a date certain, a 12-month finding on the Petition to list giraffes under the ESA, 16 U.S.C. § 1533(b)(3)(B);

C.     Award Plaintiffs their fees and costs; and

D.     Grant Plaintiffs such other relief as the Court deems just and proper.


DATED:  October 12, 2021                    Respectfully submitted,

                                            /s/ Tanya M. Sanerib
                                            Tanya M. Sanerib (DC Bar No. 473506)
                                            Telephone: (206) 379-7363
                                            tsanerib@biologicaldiversity.org
                                            Sarah Uhlemann (DC Bar No. 501328)
                                            Telephone: (206) 327-2344

suhlemann@biologicaldiversity.org
Center for Biological Diversity
2400 NW 80th Street, #146
Seattle, WA 98117

Laura Friend Smythe (D.D.C. Bar No. NY0217)
Telephone: (202) 676-2331
lsmythe@humanesociety.org
Margaret Robinson (DC Bar No. 241415)
Telephone: (202) 676-2369
mrobinson@humanesociety.org
The Humane Society of the United States
1255 23rd Street, NW, Suite 450
Washington, DC 20037

*Counsel for Plaintiffs*